UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

BLAIR ALEXANDER WEST,

     Petitioner,

v.                                                                          PETITION FOR REVIEW

FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.

     Respondent.

_____/

Blair Alexander West, hereby petitions the Court for review of the Opinion of the

Securities and Exchange Commission, entered on January 9, 2015, regarding disciplinary action

taken by FINRA against Blair Alexander West.

Dated: March 2, 2015

 

Stanford R. Solomon
ssolomon@solomonlaw.com
Florida Bar No. 302147
**THE SOLOMON LAW GROUP, P.A.**
1881 West Kennedy Boulevard
Tampa, Florida 33606-1606
(813) 225-1818 (Tel)
(813) 225-1050 (Fax)
Attorney for Blair A. West

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

SECURITIES EXCHANGE ACT OF 1934
Release No. 74030 / January 9, 2015

Admin. Proc. File No. 3-15811

In the Matter of the Application of

BLAIR ALEXANDER WEST
c/o Stanford R. Solomon, Esq.
The Solomon Group, P.A.
1881 West Kennedy Blvd.
Tampa, FL 33606-1606

For Review of Disciplinary Action Taken by

FINRA

OPINION OF THE COMMISSION

REGISTERED SECURITIES ASSOCIATION — REVIEW OF DISCIPLINARY
PROCEEDINGS

Principal of former member firm of registered securities association misused customer
funds to pay member firm's operating expenses and his personal debts without customer's
authorization in violation of just and equitable principles of trade. *Held*, association's
findings of violation and sanction imposed are *sustained*.

APPEARANCES:

*Stanford R. Solomon,* of The Solomon Group, P.A., and *David E. Robbins*, of Kaufmann
Gilden & Robbins LLP, for Blair Alexander West.

*Alan Lawhead, Jennifer Brooks,* and *Celia L. Passaro*, for the Financial Industry
Regulatory Authority, Inc.

Appeal filed: March 24, 2014
Last brief received: July 16, 2014

Blair Alexander West, sole principal of Crusader Securities LLC ("Crusader" or the "Firm"), a former FINRA member firm, appeals from FINRA disciplinary action barring him from associating with a FINRA member firm. FINRA found that West violated NASD Conduct Rule 2110 by "misu[sing] customer funds that were intended to be held in escrow pending the close of a sale and leaseback transaction."[1] As FINRA found, "[w]ithin moments" of receiving the deposited funds, West transferred the funds to pay his personal debts and fund Crusader's operating expenses, spending the entire amount over a two-month period.

West primarily contends that FINRA lacked jurisdiction to bring this action, that he was authorized to use his customer's funds, and that FINRA failed to consider mitigating factors in barring him. Following our independent review, we reject West's contentions as baseless and find that the record establishes his violation of Rule 2110 through the misuse of his customer's funds. We conclude that a bar is consistent with FINRA Sanction Guidelines and is neither excessive nor oppressive. Accordingly, we sustain FINRA's action.

### I. Background

#### A. West and Crusader

The relevant facts are largely undisputed.[2] West entered the securities industry in 1996 and in 2003 founded Crusader, a registered broker-dealer that provided boutique investment banking services, including capital raising assistance, to small companies. West was at all relevant times Crusader's President, Chief Compliance Officer, and Financial and Operations Principal. West remained associated with Crusader until February 2011, when Crusader withdrew its FINRA membership. West is not currently associated with any FINRA member.

#### B. West signed an agreement to raise capital for AmeriChip, a new customer.

In the fall of 2008, Drew Mouton, the vice chairman of the board of AmeriChip International, Inc. ("AmeriChip"), asked West to help raise capital for AmeriChip, a Nevada corporation specializing in machine equipment for the automotive industry.[3] At the time,

---

[1]     NASD Conduct Rule 2110 requires members to "observe high standards of commercial honor and just and equitable principles of trade." Since FINRA initiated this action, FINRA has renamed NASD Rule 2110 as FINRA Rule 2010 without substantive change. *Order Approving FINRA's Adoption of Certain FINRA Rules in the Consolidated Rulebook*, 73 Fed. Reg. 57,174 (Oct. 1, 2008). We apply the rule in effect at the time of the alleged misconduct.

[2]     Through his answer, the joint stipulations, and his hearing testimony, West admitted to many facts at issue in this case. *See generally James F. Glaza*, Exchange Act Release No. 50474, 2004 WL 2192392, at *4 (Sept. 30, 2004) ("[S]tipulated facts serve important policy interests . . . [and] should not be set aside without a showing of compelling circumstances.").

[3]     We take official notice pursuant to Commission Rule of Practice 323, 17 C.F.R. § 201.323, that Mouton became president and chief executive officer of AmeriChip on December 28, 2008. *See* AmeriChip Form 8-K, dated Dec. 28, 2008, at 1, *available at*

(continued...)

AmeriChip was experiencing financial difficulties. As a result, AmeriChip entered into an agreement with Crusader (the "Advisory Agreement"). On October 22, 2008, Mouton signed the Advisory Agreement on behalf of AmeriChip and West signed on behalf of Crusader.

Under the Advisory Agreement, Crusader would introduce AmeriChip to "certain capital sources, including possible financial and strategic investors and/or lenders," and AmeriChip would pay Crusader a fee for any capital that Crusader helped AmeriChip raise during the engagement.[4] The Advisory Agreement provided that this fee would be "fully earned and paid at each closing" based on a percentage of the financing raised for AmeriChip. If Crusader acted as the "escrow agent" on a capital-raising transaction, the Advisory Agreement authorized it to "retain its [capital raising] fee[] and net fund the balance to the parties in that particular transaction."

## C.     West facilitated a sale/leaseback transaction and agreed to hold an initial deposit for the transaction with Crusader.

Crusader soon introduced AmeriChip to a potential capital source, Ability Capital Solutions, Inc. ("Ability"), an asset-based finance company specializing in equipment finance and leasing. On December 9, 2008, West forwarded Ability's proposed term sheet (the "Term Sheet") to Mouton. Under the Term Sheet, Ability offered to provide AmeriChip a loan in the form of a sale/leaseback transaction in which Ability would purchase equipment from an AmeriChip subsidiary for $3.5 million and then lease the purchased equipment back to AmeriChip's subsidiary at $56,756.84 a month for seven years. According to this draft of the Term Sheet, AmeriChip would make an initial deposit of $113,513.68 with Ability, representing the first and last payments under the transaction (the "Deposit").

Mouton told West and Crusader that AmeriChip's board of directors would provide the Deposit to Ability only if the funds were held in escrow. Because Ability did not have an escrow account and was reluctant to open one, West proposed that Crusader hold the Deposit in a Crusader account for the transaction. The parties agreed and West revised the Term Sheet (the "Revised Term Sheet") to reflect that "[t]he First and Last Payment in the amount of $113,513.68 [i.e., the Deposit] will be wired to Crusader . . . upon acceptance of this letter and held by Crusader until closing." The Revised Term Sheet also provided that the Deposit would be returned to AmeriChip "promptly" if the transaction terminated.

West sent Mouton the Revised Term Sheet and another document titled "Crusader Securities Escrow Account Bank Wire Instructions." West's wiring instructions directed Mouton to wire the Deposit to the "[Crusader] Escrow Account" at HSBC Bank USA (the "HSBC Account"). Although the wiring instructions referred to the HSBC Account as an escrow

---

(...continued)

http://www.sec.gov/Archives/edgar/data/1132487/000115752309000157/maindoc.htm (all websites last visited on Dec. 10, 2014).

[4]     In addition, AmeriChip paid Crusader an advisory fee under the Advisory Agreement, but such other compensation is not relevant here.

account, it is undisputed that there was no escrow agreement or escrow agent and the account was entirely in West's control.

On December 19, 2008, Mouton signed the Revised Term Sheet on behalf of AmeriChip,[5] and Mouton wired the Deposit to the HSBC Account on December 24, 2008. The parties thereafter continued their negotiations toward finalizing the transaction.

**D.      After negotiations on the sale/leaseback transaction faltered, Mouton demanded that West return the Deposit; West delayed returning the Deposit and failed to disclose his misuse of the money.**

By mid-February 2009, negotiations on the proposed sale/leaseback transaction began to falter. In e-mails to West at the time, Mouton expressed his displeasure with the delays in completing the transaction and asked West to terminate negotiations and return the Deposit to AmeriChip. West repeatedly delayed returning the Deposit to Mouton. Instead, West sought more time to complete the deal and suggested to Mouton that Crusader continued to hold the funds. To the contrary, West had withdrawn and spent the entire Deposit on personal and unrelated business expenses by March 2009. At no point did West inform Mouton that he already had spent the Deposit.

**1.      West spent the Deposit on personal debts and Crusader operating expenses.**

West concedes that, shortly after Mouton wired the Deposit to Crusader, he transferred $89,000 of it to a Crusader operating account. Before the transfer, the operating account had a negative balance and recently had incurred service charges for insufficient funds. West then transferred $72,500 of the $89,000 to his personal checking account and transferred an additional $7,500 to the operating account for Crusader Financial Group, Inc. ("Crusader Financial"), the parent company of Crusader. Before West deposited those funds into his personal bank account, the account had maintained a negative balance for at least two weeks and incurred service charges for insufficient funds. West left the remaining $9,000 of the $89,000 in Crusader's operating account.

On December 26, 2008, West began depleting the funds he had transferred to his personal account. He made mortgage payments totaling $27,000, paid $3,500 on his home equity line of credit, made $5,500 in payments to other creditors, and paid other personal expenses, including cable television fees, car payments, clothing purchases, golf- and tennis-club fees, and telephone bills. By January 2009, West had spent the entire $72,500 he had deposited into his personal account and the $16,500 he had transferred to other Crusader business accounts. Over the ensuing months, West transferred the remainder of the Deposit ($24,500) from the HSBC Account to Crusader's accounts and his personal account and spent all of it on personal and Crusader operating expenses.

---

[5]      Mouton accepted the terms of the agreement as the "lead director" and "vice chair" of the board of AmeriChip's affiliate, KSI Machine & Engineering, Inc.

### 2.    West repeatedly delayed returning the Deposit to Mouton.

While West was spending the Deposit, the negotiations between AmeriChip and Ability had stalled, causing Mouton to ask for a return of the funds. On February 16, 2009, Mouton wrote to West, "I'm assuming no word from [Ability]. We're [now] into the 8th week since making that deposit—I need a resolution one way or the other." In an e-mail shortly thereafter, Mouton requested that West return the Deposit: "I need to put that cash to use," Mouton stated, "Time to call it." West responded by asking Mouton to wait for an update from Ability.

Mouton sent West another e-mail on February 23, 2009, asking about the transaction. Mouton asked West, "Have you communicated with [Ability] that 9 weeks is too long, and we need a commitment now or the return of deposits?" adding "[t]oday's the day." West responded, "Yes . . . they need to make a decision this week or return the deposit . . . ." West suggested that, if the deal with Ability was terminated, Crusader should keep "the [D]eposit we hold" and apply it to other potential deals, but Mouton rejected the suggestion and responded that "[t]he funds you hold are mine personally . . . with terms that require short-term payback, so they'll need to come back. This new deal . . . we'd fund from a different source . . . ." Two days later, Mouton e-mailed West wiring instructions for a return of the Deposit.

Although West responded by asking Mouton to "just be patient a few more days," Mouton responded by reemphasizing the importance of returning the Deposit to him. Mouton told West that, if the transaction did not move forward soon, "I *have* to get that cash back to put [it] to use" (asterisks as emphasis in original).

Mouton's frustration increased in March 2009. For example, on March 4, 2009, Mouton e-mailed West:

> It's now been 2 more weeks since we were "close" to getting something closed, and 10 weeks since initiating this deal.
>
> What am I supposed to do here? At this point, my internal credibility with my Board is damaged . . . . I'm sitting around waiting for who knows what, after giving "pass or fail instructions," just in order to get my own personal $130k deposit funds back, *long* after any reasonable deal should have closed.

(Asterisks as emphasis in original). The next day, West responded, "I know it has been many weeks to get to this point but I ask that you please be patient just a little while longer while we push to get this deal closed for you." Again, West did not disclose that he already had spent the funds.

Mouton raised the issue of the funds again in a March 10, 2009, e-mail to West: "[I]nsofar as I gave *explicit instructions* going on 3 weeks ago to get an answer or return deposits, and have repeated it now multiple times without result, how can you expect my Board to have any comfort that those deposit funds are even still there?" (Asterisks as emphasis in original).

In his response, West did not address Mouton's concerns about the Deposit's whereabouts. Instead, he wrote, "I understand. We have been riding [Ability] everyday . . . . All I can tell you is what [Ability] is telling me .. .." In his hearing testimony, West conceded that at the time of this correspondence he was not about to admit to Mouton that he had already spent the Deposit. West explained that he withheld this information from Mouton because it concerned "my personal business" but admitted that his nondisclosure "was a mistake."

Finally, on April 8, 2009, Mouton sent an e-mail to a representative from Ability (copying West), asking Ability to confirm release of the Deposit. Ability's representative replied that day, "releasing the funds from escrow."

### 3. After Ability confirmed the release of the funds, West delayed returning the Deposit to AmeriChip.

After Ability confirmed the release of the funds, Mouton provided West with bank wiring instructions and requested that West wire the funds by April 9, 2009. When West failed to return the Deposit by that date, Mouton asked West in an April 11, 2009, e-mail if there was a problem:

> I haven't gotten an email from you in almost a full month . . . . I haven't gotten a comment or response on the 4 messages I've sent since last Friday. Is there some kind of problem I need to be aware of?
>
> More immediately, what else do I have to do in order to get you to return the $113,513.68 I wired to your escrow account in December?
>
> I've already made it clear to you that [this] is causing me a lot of problems, so I need you to address this immediately.

On April 14, West replied, "I will try to get you a wire back before the end of this week or at worst early next."[6]

When Mouton did not receive the Deposit by April 22, he demanded an explanation: "Please tell me where my money is . . . ." West responded by apologizing without explanation, assuring Mouton, "You will have the wire this week." Frustrated, Mouton replied, "What exactly does that mean? I need to know specifics that I can rely on, and why this continues to drag on?" West did not respond to this e-mail.

---

[6]     West did not respond for three days, later claiming he was out of the office and unavailable.

**4.** **While West sought to replace the missing funds, Mouton complained to regulatory authorities about West's failure to return the Deposit.**

On April 23, 2009, Mouton e-mailed West that he had waited long enough and that it was "evident that rather than remain in a segregated escrow account, my funds have been converted to some other use, which is a crime." Mouton further stated that, if he did not receive the funds by day's end, he would contact FINRA and the New York Attorney General the next morning.

West responded to Mouton's e-mail immediately, assuring Mouton that he expected to send the wire the following day and noting for the first time in their discussions that "Crusader has no escrow agreement with you or [AmeriChip]." West further claimed that "the funds [were] in a time sensitive deposit that did not make them readily available."

West did not return the Deposit the next day as he had promised. Instead, West wrote to Mouton, "We are hoping to get your wire instructions to the bank this afternoon but it may slip [until] Monday. We assure you that you ARE getting the money back . . . and ask for your patience just a little while longer" (emphasis in original).

In the meantime, West had been trying to replace the missing Deposit funds by renting his home for the summer. By "late February or early March," West testified, he and a renter had agreed on a price of $160,000, although no lease had been signed. West explained that the potential renter took weeks to review the lease because West had structured the rental agreement to avoid having to pay taxes on the lease proceeds, which complicated the transaction. West testified that, if the lease had fallen through, he would have "borrowed money from [his] family" to repay the Deposit.

On April 27, 2009, West and the renter signed the lease, although West had yet to receive funds from the renter. West e-mailed Mouton promising that the Deposit would be sent "this afternoon," but later in the day West informed Mouton that he would not return the Deposit that day. West claimed, "I just checked with the bank and it does not appear as though the wire went out this afternoon. Not sure why but I was assured it would be going out tomorrow." Although West blamed the bank, West did not have the funds to repay the Deposit.

On April 28, 2009, when the Deposit did not appear in his bank account, Mouton filed a formal complaint with FINRA. Mouton also told West that the "New York [Attorney General's Office] is waiting confirmation of funds transfer, since you said it would be today, and as I informed them . . . . I have no problem pulling my complaints when the transfer occurs."[7] West responded with a series of heated e-mails, telling Mouton that he had hired an attorney to handle Mouton's "threats of criminal activity to resolve a civil matter," emphasizing that AmeriChip had "no written agreement" with Crusader, and threatening Mouton by stating, "You will get the wire but this is far from over." But West still did not inform Mouton that he lacked the funds to repay the Deposit.

---

[7]  Mouton testified that he filed complaints with FINRA, the New York's Attorney General, and the Federal Bureau of Investigation on April 28, 2009.

On April 29, 2009, West received the rental payment and, after over two months of delays, wired the funds to Mouton to replace the Deposit.

**E.      FINRA barred West from associating with any FINRA member.**

Based on Mouton's complaint, FINRA opened an investigation and then filed a disciplinary action against West for misuse of customer funds. In his answer to FINRA Department of Enforcement's complaint, West admitted that, "[w]hen Crusader accepted AmeriChip's funds pending the closing of [the proposed sale/leaseback transaction] . . . , those funds should have been kept *untouched* in a separate Crusader account until the closing" (italics in original). He also conceded in his answer that before the closing of the transaction he used the "entirety of the . . . Deposit to pay business expenses of Crusader and to pay his own personal expenses." After a two-day hearing, a Hearing Panel found that West misused AmeriChip's funds and barred West for his misconduct.[8] West appealed the decision to the National Adjudicatory Council (the "NAC") but only challenged the bar imposed.[9]

On February 20, 2014, the NAC affirmed the Hearing Panel's decision, noting West's failure to contest liability. The NAC concluded that "West's misconduct in this case represents an egregious breach of trust on the part of an experienced securities industry professional, and . . . [that] a bar is abundantly supported." This appeal followed.

## II. Analysis

We base our findings on an independent review of the record and apply a preponderance of the evidence standard for self-regulatory organization disciplinary actions.[10] Pursuant to Exchange Act Section 19(e)(1), in reviewing an SRO disciplinary action, we determine whether the aggrieved person engaged in the conduct found by the SRO, whether such conduct violated the securities laws or SRO rules, and whether those rules are, and were applied in a manner, consistent with the purposes of the Exchange Act.[11]

---

[8]     The Hearing Panel further found, as FINRA had alleged, that West caused Crusader to violate Exchange Act Rule 15c-4 with respect to another customer by releasing funds required to be held in escrow before the minimum contingency of the securities offering was met. But given its decision to bar West for misuse of AmeriChip's funds, the Hearing Panel declined to impose any sanction for this violation. West did not appeal these findings to the NAC or the Commission.

[9]     West's brief on appeal to the NAC conceded that "[West] did misuse [customer funds]" but requested "fairness and mercy" in overturning the bar imposed.

[10]     *See Richard G. Cody*, Exchange Act Release No. 64565, 2011 WL 2098202, at *9 (May 27, 2011) (citing *Seaton v. SEC*, 670 F.2d 309, 311 (D.C. Cir. 1982) (upholding preponderance of evidence standard in FINRA disciplinary proceeding)), *aff'd*, 693 F.3d 251 (1st Cir. 2012).

[11]     15 U.S.C. § 78s(e); *see, e.g.*, *Joseph Abbondante*, Exchange Act Release No. 53066, 2006 WL 42393, at *6 (Jan. 6, 2006), *petition denied*, 209 F. App'x 6 (2d Cir. 2006). West does

(continued...)

### A. West misused his customer's funds in violation of NASD Conduct Rule 2110 when he used the Deposit to pay for his personal and business expenses.

NASD Conduct Rule 2110 requires the observance of "high standards of commercial honor and just and equitable principles of trade."[12] Rule 2110 is "designed to enable [FINRA] to regulate the ethical standards of its members."[13] The Rule "serves as an industry backstop for the representation, inherent in the relationship between a securities professional and a customer, that the customer will be dealt with fairly and in accordance with the standards of the profession."[14] To this end, Rule 2110 sets forth a standard intended to encompass "a wide variety of conduct that may operate as an injustice to investors or other participants in the marketplace."[15] "[W]e have long applied a disjunctive 'bad faith or unethical conduct' standard to disciplinary action under [Rule 2110]."[16] Proof of scienter is not required.[17]

We find that West violated NASD Rule 2110. "[M]isuse of customer funds is 'patently antithetical to the high standards of commercial honor and just and equitable principles of trade that [FINRA] seeks to promote.'"[18] The record establishes West's misuse of his customer's funds. On December 24, 2008, his customer AmeriChip deposited $113,513.68 with Crusader to hold until the closing of a sale/leaseback transaction. On the same day that Crusader received the funds, West transferred $89,000 out of the HSBC Account to pay his personal and business expenses, spending the entire $113,513.68 over a two-month period. West admitted in his answer that he should have "kept [the funds] *untouched* in a separate Crusader account until the closing," a belief shared by his customer, who testified that he thought the funds were being held in escrow.

---

(...continued)
not argue, and the record does not support a finding, that Rule 2110 is, or FINRA's application of it was, inconsistent with the Exchange Act.

[12]   Rule 2110 applies to West through NASD Rule 115 (now FINRA Rule 140), providing that persons associated with a member have the same duties and obligations as a member.

[13]   *Heath v. SEC*, 586 F.3d 122, 132 (2d Cir. 2009) (discussing NYSE Rule 476, counterpart to NASD Rule 2110), *aff'g Thomas W. Heath*, Exchange Act Release No. 59223, 2009 WL 56755 (Jan. 9, 2009). We interpret and apply all SRO just-and-equitable rules under the same analysis and precedent. *See, e.g., Dante J. DiFrancesco*, Exchange Act Release No. 66113, 2012 WL 32128, at *5 & n.19 (Jan. 6, 2012) (applying *Heath*, 2009 WL 56755, at *4).

[14]   *DiFrancesco*, 2012 WL 32128, at *5 & n.21 (citing *Heath*, 2009 WL 56755, at *4).

[15]   *Id.* at *5 & n.22 (citing *Heath*, 2009 WL 56755, at *5 & n.13).

[16]   *Id.* at *5 & n.19 (citing *Heath*, 2009 WL 56755, at *4).

[17]   *Heath*, 586 F.3d at 132-34 (discussing Commission precedent).

[18]   *Henry E. Vail*, Exchange Act Release No. 35872, 1995 WL 380152, at *2 n.12 (June 20, 1995) (quoting *Wheaton D. Blanchard*, Exchange Act Release No. 12484, 1976 WL 160367, at *1 (May 27, 1976)), *aff'd*, 101 F.3d 37 (5th Cir. 1996); *see also Janet Gurley Katz*, Exchange Act Release No. 61449, 2010 WL 358737, at *16 & n.21 (Feb. 1, 2010) (same), *petition denied*, 647 F.3d 1156 (D.C. Cir. 2011).

The underlying agreements support this conclusion. The Revised Term Sheet specified that the Deposit be "held until closing" and returned to AmeriChip "promptly" if the transaction terminated. West and Crusader were not parties to the Revised Term Sheet, but West drafted the document and knew of its requirements and the expectations of his customer, who was a party. And, while the parties' Advisory Agreement allowed Crusader to "retain its fees" from any escrow account it managed, the Agreement also specified that Crusader's fee was "fully earned and paid *at each closing*" (emphasis added).[19]

Although we need not find scienter to establish a violation of Rule 2110, we believe the record amply supports finding that West acted intentionally and in bad faith.[20] Notwithstanding the clear limitations on the use of the Deposit until the transaction closed, West admits that he began using the funds almost immediately to pay his overdue personal debts and fund Crusader's operating expenses. West's concealment of his actions from his customer and his deceit further demonstrate deliberate intent and bad faith.[21] Numerous e-mails show that West concealed his misuse of the funds from Mouton and delayed returning the Deposit until he replaced the funds. Mouton, frustrated with West's delay, directly asked West where his money was, but West did not disclose that he had spent it. He implied that Crusader still held the funds and affirmatively misrepresented to Mouton that the funds were "not readily available" because they were "in a time sensitive deposit." West faulted his bank for failing to wire the funds, when he knew there were no funds in the HSBC Account for the bank to wire.

## B. West's arguments on appeal are without merit.

West makes a variety of arguments on appeal challenging the NAC's findings of liability. He claims that FINRA lacks jurisdiction to bring this action because the underlying transaction did not involve a security, that he was orally authorized by Mouton to use the deposited funds as

---

[19] Because West lacked authority to pay himself Crusader's fee before closing, we find irrelevant his argument that his "[expected] fee would have easily been well in excess of $89,000."

[20] *See Edward S. Brokaw*, Exchange Act Release No. 70883, 2013 WL 6044123, at *10 (Nov. 15, 2013) (defining "bad faith" as "[d]ishonesty of belief or purpose"). It is well established that "[i]ntent may be proved through circumstantial evidence and inferences drawn from surrounding circumstances." *Thomas C. Kocherans*, Exchange Act Release 36556, 1995 WL 723989, at *2 (Dec. 6, 1995) (collecting cases).

[21] *See Peter W. Schellenbach*, Exchange Act Release No. 30030, 1991 WL 288493, at *3 (Dec. 4, 1991) (finding applicant's deliberate intent to conceal his firm's net capital position from regulators established bad faith and thus violated the just and equitable principles of trade), *aff'd*, 989 F.2d 907 (7th Cir. 1993); *cf. Jonathan Feins*, Exchange Act Release No. 41943, 1999 WL 770236, at *4 (Sept. 29, 1999) (finding "evidence that [applicant] deliberately concealed his conduct from the Exchange established that he knew his conduct was wrongful"); *Long v. Bd. of Governors of the Fed. Reserve Sys.*, 117 F.3d 1145, 1152-54 (10th Cir. 1997) (finding bank executive's pecuniary gain in transferring bank shares and concealment of the transfer from his board, among other things, established his bad faith).

he did, and that his delay in returning the Deposit was caused by his concerns about Mouton's loyalty to AmeriChip. As explained below, we reject those arguments.[22]

1.    Actions brought under NASD Rule 2110 need not involve a security.

We reject West's claim that FINRA lacked jurisdiction to bring this action because "[t]he underlying transaction was not a securities transaction." It is well established that FINRA's "disciplinary authority [under NASD Rule 2110] is broad enough to encompass business-related conduct that is inconsistent with just and equitable principles of trade even if that activity does not involve a security."[23] West's misconduct here occurred in connection with his Firm's business dealings with AmeriChip. Although his deliberate misuse of this customer's funds did not involve securities, we find that such wrongdoing reflects negatively both on his ability to comply with regulatory requirements and ability to fulfill his responsibilities in handling customer funds.[24] We accordingly find a sufficient basis for FINRA's jurisdiction under Rule 2110.[25]

---

[22]    FINRA asserts in its opposition brief that West's challenges to the NAC's findings of liability are waived because he effectively conceded liability before the NAC. *See supra* note 9. We nonetheless consider West's arguments in our discretion as part of our review of FINRA's action.

[23]    *Vail v. SEC*, 101 F.3d 37, 39 (5th Cir. 1996); *see also Ialeggio v. SEC*, 185 F.3d 867, 1999 WL 362896, at *2 (9th Cir. 1999) (Table) (same); *Daniel D. Manoff*, Exchange Act Release No. 46708, 2002 WL 31769236, at *4 (Oct. 23, 2002) (noting that application of Rule 2110 to business-related conduct not involving a security "is well established"); *Thomas E. Jackson*, Exchange Act Release No. 11476, 1975 WL 162936, at *2 (June 16, 1975) (stating that, although "[applicant's] wrongdoing in this instance did not involve securities, [FINRA] could justifiably conclude that on another occasion it might").

[24]    *See, e.g., Manoff*, 2002 WL 31769236, at *4 (finding that registered representative's misconduct, which did not include a security but unauthorized use of a co-worker's credit card, calls into question his ability to fulfill his responsibilities of handling other people's money); *James A. Goetz*, Exchange Act Release No. 39796, 1998 WL 130849, at *3 (Mar. 25, 1998) (finding registered representative's misconduct, which did not include a security but disregarded the rules of his firm's charitable organization and misled the organization, "reflects directly on [his] ability both to comply with regulatory requirements fundamental to the securities business" and fulfill responsibilities "in handling other people's money").

[25]    The NAC did not, as West asserts, find that the transaction with Ability was a "best efforts" securities offering. That finding was made by the Hearing Panel and related to another customer's transaction, not the subject of this appeal. *See Richard G. Cody*, Exchange Act Release No. 64565, 2011 WL 2098202, at *22 n.89 (May 27, 2011) ("[I]t is the decision of the NAC, not . . . the Hearing Panel, that is . . . subject to Commission review" (citation and quotation omitted)), *aff'd*, 693 F.3d 251 (1st Cir. 2012).

**2.    West did not establish that Mouton gave West verbal authorization to use the funds before the closing of the sale/leaseback transaction.**

Despite the express limitations on the use of funds in the Revised Term Sheet and Advisory Agreement, West contends he had a "prior oral agreement" with Mouton to use the funds as he did. West cites a May 2009 letter that Mouton submitted to FINRA after West had repaid the Deposit, in which Mouton stated "there was no written agreement" restricting "how the . . . deposit was to be held" and that Crusader could use the deposit "at Crusader's discretion . . . until the expected closing of the [transaction]." But West admits that he drafted the letter for Mouton in connection with his May 2009 request that Mouton retract his complaint to FINRA. Moreover, during the resulting FINRA investigation, Mouton stated in a sworn September 2009 declaration that he had no discussions with West about his use of the Deposit and believed that the "funds would be held in an escrow account until the closing." Mouton also testified under oath that he never authorized West to prepay himself fees from the Deposit.

The May 2009 letter is also contradicted by other, contemporaneous evidence in the record. The Revised Term Sheet itself clearly states that the Deposit was to be held "until closing" and the Advisory Agreement states that any fees owing to Crusader would be earned at the closing. And in contemporaneous e-mail communications, when Mouton demanded a return of the Deposit, West delayed, deflected blame to others, and falsely claimed that the funds were in a "time sensitive deposit." West never disclosed his use of the funds. This concealment is inconsistent with West's claim that Mouton authorized him to use the funds.[26]

**3.    There is no support for West's claim that he delayed repayment because of his concerns about Mouton.**

Equally unavailing is West's assertion that his delay in returning the Deposit was justified by his "valid concerns . . . [about] Mouton's loyalty and commitment to" West's customer AmeriChip. When Mouton signed the Advisory Agreement and the Revised Term Sheet on behalf of AmeriChip, he was the vice chairman of the board of AmeriChip and shortly thereafter became AmeriChip's president and CEO.[27] He had authority to act on AmeriChip's behalf, and whether Mouton had another motive for requesting a return of the Deposit is irrelevant. The relevant inquiry is whether West misused his customer's funds, which the record fully establishes.[28]

---

[26]    *See Cathy Jean Krause Kirkpatrick*, Exchange Act Release No. 40630, 1998 WL 764457, at *5 (Nov. 3, 1998) (finding registered representative violated just and equitable principles of trade by, among other things, misappropriating customer funds and rejecting claim that customer had orally authorized the use the funds because representative's "acts of concealment [were] inconsistent" with such authority).

[27]    See *supra* note 3.

[28]    Accordingly, we also reject West's related claim that FINRA conducted an unfair or improper investigation because it did not consider Mouton's motive for requesting the Deposit be returned. In conducting our *de novo* review, we found no evidence of unfair treatment. *See*

(continued...)

Moreover, the record does not substantiate that West had any concerns about Mouton at the time. West never suggested in his contemporaneous e-mails to Mouton that he had concerns about Mouton's loyalty. Nor did West adduce any evidence showing that he had expressed his concerns to AmeriChip or any other person. Rather, the record establishes that he spent the entire Deposit to pay personal and Crusader business expenses and delayed returning the Deposit because he lacked the funds to repay it.

Accordingly, based on the reasons stated above, we find that West engaged in the conduct found by FINRA, that such conduct violates Rule 2110, and that Rule 2110 is, and was applied in a manner, consistent with the purposes of the Exchange Act.

### III. Sanction

Pursuant to Exchange Act Section 19(e)(2), we will sustain a FINRA sanction unless we find, "having due regard for the public interest and the protection of investors," that the sanctions are "excessive or oppressive" or impose an "unnecessary or inappropriate burden on competition."[29] As part of this review, we consider any aggravating or mitigating factors presented[30] and whether the sanctions imposed by FINRA are remedial and not punitive.[31] Though not bound by FINRA's Sanction Guidelines, we use them as a benchmark for our review under Exchange Act Section 19(e)(2).[32]

For the improper use of customer funds, the Sanction Guidelines recommend imposing a bar as the standard sanction, unless "the improper use resulted from respondent's misunderstanding of his or her customer's intended use of the funds or securities, or other mitigation exists."[33] The Sanction Guideline for improper use of customer funds does not specify any additional factors but directs adjudicators to the Sanction Guidelines' Principal

---

(...continued)
*Cody*, 2011 WL 2098202, at *19 (rejecting claim that FINRA was biased and applicant was unfairly treated and noting our *de novo* review cures such error).

[29]     15 U.S.C. § 78s(e)(2). West does not claim, nor does the record show, that FINRA's action imposed an unnecessary or inappropriate burden on competition.

[30]     *See Saad v. SEC*, 718 F.3d 904, 906 (D.C. Cir. 2013); *PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1064-65 (D.C. Cir. 2007).

[31]     *See PAZ*, 494 F.3d at 1065.

[32]     *Capwest Sec., Inc.*, Exchange Act Release No. 71340, 2014 WL 198188, at *9 (Jan. 17, 2014) (citation omitted). FINRA adopted the Sanction Guidelines to ensure "greater consistency, uniformity, and fairness in the sanctions that are imposed for violations." *Richard A. Neaton*, Exchange Act Release 65598, 2011 WL 5001956, at *12 n.38 (Oct. 20, 2011).

[33]     FINRA Sanction Guidelines, http://www.finra.org/web/groups/industry/@ip/@enf/@sg/documents/industry/p011038.pdf, at 36 ("Sanction Guidelines").

Considerations for a non-exhaustive list of aggravating and mitigating factors. The relevance of these factors depends on the facts and circumstances of each case.[34]

**A.      FINRA's imposition of a bar was neither excessive nor oppressive.**

We find that a bar is consistent with the Sanction Guidelines and sustain the sanction imposed by the NAC because it is neither excessive nor oppressive. Misappropriation or misuse of customer funds constitutes a serious violation of the securities laws, involving a betrayal of the most basic and fundamental trust owed to a customer.[35] The obligation to protect customer assets is paramount to operating in the securities industry.[36]

AmeriChip entrusted West with holding its funds in escrow until the closing of the transaction with Ability. West violated his customer's trust when, upon receipt of these funds, he transferred the funds out of the HSBC Account to pay his personal debts and fund Crusader's operations without authorization. The securities industry "presents many opportunities for abuse and overreaching and depends very heavily upon the integrity of its participants."[37] West's misuse of his customer's funds demonstrates his disregard for fundamental ethical principles and unfitness to practice in the securities industry.[38]

The NAC referenced four aggravating factors that provide further support for imposition of a bar here. First, West's misconduct was intentional,[39] as evidenced by, among other things, his use of the funds just after drafting the Revised Term Sheet that required the Deposit be held by Crusader "until the closing." Second, West engaged in numerous deceptive acts to conceal his actions from his customer.[40] Despite Mouton's persistent inquiries, West failed to disclose

---

[34]      *Id.* at 6.

[35]      *Katz*, 2010 WL 358737, at *25 (stating that "[m]isappropriating client funds and making misstatements [to the client] are serious misconduct"); *Kevin Lee Otto*, Exchange Act Release No. 43296, 2000 WL 1335346, at *4 (Sept. 15, 2000) (observing that a registered representative's misuse of customer funds "demonstrate[s] a serious misunderstanding of the obligations" owed to customers), *aff'd*, 253 F.3d 960 (7th Cir. 2001).

[36]      *See, e.g., Broker-Dealer Reports*, Exchange Act Release 70073, 2013 WL 4456076, at *135 (Ju ly 30, 2013) (stating that "safeguarding of customer securities and cash held by broker-dealers is of paramount importance as demonstrated by recent cases where the broker-dealers failed to protect customer securities and cash").

[37]      *Robert Conway*, Exchange Act Release No. 70833, 2013 WL 5960703, at *11 (Nov. 7, 2013) (finding violations of NASD Conduct Rule 2110).

[38]      *See supra* note 35.

[39]      *See* Sanction Guidelines, *supra* note 33, at 7 (Principal Consideration No. 13: "[w]hether respondent's misconduct was the result of an intentional act, recklessness, or negligence").

[40]      *See id.* at 6 (Principal Consideration No. 8: "[w]hether the respondent engaged in numerous acts and/or a pattern of misconduct"; Principal Consideration No. 10: "[w]hether the
(continued...)

that he had spent the Deposit and he misrepresented the whereabouts of the funds.[41] Third, he benefitted from his misconduct.[42] His use of customer funds enabled him to fund Crusader's continued operations, make payments on his overdue mortgage, and pay various other debts. Fourth, his misconduct occurred over "an extended period of time," four months, from December 26, 2008, through April 29, 2009, and did not end until after Mouton contacted regulatory authorities about West's failure to return the Deposit.[43]

### B.    The NAC properly considered and rejected West's arguments concerning mitigating factors.

West claims that the NAC "declined to consider any mitigating factors." Before the NAC, he cited as mitigating factors a misunderstanding over AmeriChip's intended use of the funds, his lack of disciplinary history, his substantial assistance during FINRA's investigation, and Mouton's withdrawal of his FINRA complaint. We find that the NAC properly considered and rejected West's claims of mitigation.[44]

We agree with the NAC that there was no misunderstanding over the customer's intended use of the funds. The terms of the underlying agreements were unambiguous: West was not entitled to Crusader's fees "until the closing" and was obligated to return the Deposit "promptly" if the transaction terminated. West signed the Advisory Agreement and personally drafted the

---

(...continued)
respondent attempted to conceal his or her misconduct or to lull into inactivity, mislead, deceive or intimidate a customer").

[41]    For example, West suggested that the Deposit was in a "time-sensitive deposit" and that Mouton apply the "the Deposit we hold" to another transaction, when West had already spent the Deposit. He also failed to deliver on promises that repayment was imminent, when he still had not replaced the funds he had spent.

[42]    Sanction Guidelines, *supra* note 33, at 7 (Principal Consideration No. 17, "[w]hether the respondent's misconduct resulted in the potential for the respondent's monetary or other gain").

[43]    Sanction Guidelines, *supra* note 33, at 6 (Principal Consideration No. 9: "[w]hether the respondent engaged in the misconduct over an extended period of time"); *see also Otto*, 2000 WL 1335346, at *4 (finding aggravating that applicant "delayed returning [customer's] funds for at least four months"). West contends his misconduct occurred over a shorter period, beginning on April 8, when Ability released the Deposit, until April 29, 2009, when he returned the funds to Mouton. But his contention ignores both that he had no authority to use the Deposit in December 2008, when his violative conduct commenced, and that Mouton began asking for the return of the Deposit in February.

[44]    Because we conclude that the NAC properly rejected West's claims of mitigation, we reject West's contention that its failure to consider mitigating factors shows it had an "unjustified prejudice[] against . . . [him]." We found no evidence of such bias in our review of the record. Moreover, "our *de novo* review of this matter cures whatever bias . . . , if any, that may have existed below." *Robert Bruce Orkin*, Exchange Act Release No. 32035, 1993 WL 89023, at *5 (1993), *aff'd*, 31 F.3d 1056 (11th Cir. 1994).

Revised Term Sheet restricting his use of the Deposit. West's concealment of his use of the Deposit from Mouton further demonstrates that he knew that the deposited funds were to be held in the HSBC Account until the closing of the transaction.

Contrary to West's assertions, "lack of disciplinary history is not a mitigating factor" under FINRA's Sanction Guidelines because, as we have stated, securities professionals "'should not be rewarded for acting in accordance with [their] duties.'"[45] In any event, West's misconduct here is not "aberrant," as he urges.[46] Pursuant to findings under Count 2 of FINRA's underlying complaint not appealed by West, he admittedly misused another customer's funds that were required to be held in escrow for another transaction.[47]

We also find that West did not substantially assist FINRA's investigation so as to justify reducing the sanction.[48] Although West states that he supplied "extremely sensitive and unduly personal information, including entirely irrelevant information about [his] wife and . . . young children," he does not substantiate his claim. This information was provided in response to FINRA's request pursuant to FINRA Rule 8210. Rule 8210 required that he produce the information requested or be subject to FINRA disciplinary action for failure to cooperate.[49] Associated persons do not provide substantial assistance by simply fulfilling their obligations to provide FINRA information pursuant to an investigation.[50]

---

[45] *Busacca v. SEC*, 449 F. App'x 886, 893 (11th Cir. 2011) (quoting *Philippe N. Keyes*, Exchange Act Release No. 54723, 2006 WL 3313843, at *6 (Nov. 8, 2006)); *see also Rooms v. SEC*, 444 F.3d 1208, 1214 (10th Cir. 2006).

[46] In support, West cites to Principal Consideration No. 16, but that factor applies to FINRA "member firm[s]," not associated persons. *See* Sanction Guidelines, *supra* note 33, at 7 (Principal Consideration No. 16: "[w]hether the respondent member firm can demonstrate that the misconduct at issue was aberrant or not otherwise reflective of the firm's historical compliance record").

[47] *See supra* note 8 (discussing findings with respect to Count 2 of FINRA's complaint).

[48] Sanction Guidelines, *supra* note 33, at 7 (Principal Consideration No. 12: "[w]hether the respondent provided substantial assistance to FINRA in its examination and/or investigation").

[49] FINRA Rule 8210 (requiring member firms and their associated persons to provide information to FINRA during an investigation); *see also Jay Alan Ochanpaugh*, Exchange Act Release No. 54363, 2006 WL 2482466, at *5 (Aug. 25, 2006) (stating that the obligation to supply information under Rule 8210 "stems from the contractual relationship entered into voluntarily by [FINRA] members and associated persons with [FINRA]").

[50] *Kent M. Houston*, Exchange Act Release No. 71589A, 2014 WL 936398, at *7 & n.56 (Feb. 20, 2014) (citing *Keyes*, 2006 WL 3313843, at *6 n.22 (holding that applicant's "cooperation in the [FINRA] investigation was consistent with the responsibilities he agreed to when he became an associated person and does not constitute substantial assistance")); *see also Brokaw*, 2013 WL 6044123, at *18 & n.139 (same).

Nor does Mouton's withdrawal of his complaint mitigate West's misconduct. FINRA's "power to enforce its rules is independent of a customer's decision not to complain," which may be influenced by many factors.[51] This applies equally to a customer's decision to withdraw a complaint, which occurred here only after West repaid Mouton. And Mouton nonetheless testified that West did not have any right to prepay himself fees from the Deposit that was to be held in escrow.[52]

## C.    We reject West's new claims concerning mitigation.

On appeal, West lists additional factors that we find not mitigating.[53] He argues that the absence of several aggravating factors specified in the Principal Considerations should be considered mitigating, an argument that we have repeatedly rejected in a variety of circumstances.[54] Accordingly, we reject West's arguments that, because he did not attempt to delay FINRA's investigation, conceal information from FINRA, or provide inaccurate or misleading information to FINRA, his misconduct is mitigated. It is similarly not mitigating that he was not previously sanctioned for the same misconduct, that he was not previously warned about the misconduct, and that his misconduct involved a non-securities transaction.[55]

West also asserts for the first time in this appeal that his repayment of the Deposit constitutes mitigation under Principal Consideration No. 4, which recommends consideration of "whether respondent voluntarily and reasonably attempted prior to detection and intervention to pay restitution."[56] We disagree with West's description of his attempts to return his customer's

---

[51]    *Maximo Justo Guevara*, Exchange Act Rel. No. 42793, 2000 WL 679607, at \*6 (May 18, 2000) (collecting cases), *petition denied*, 47 F. App'x 198 (3d Cir. 2000); *see also Raymond M. Ramos*, Exchange Act Release No. 26007, 1988 WL 902244, at \*4 (Aug. 18, 1988) (barring broker for misuse of customer funds despite customer having sought leniency for the broker).

[52]    As discussed, *supra* notes 27-28 and accompanying text, West's assertion that Mouton lacked authority to act on behalf of AmeriChip is unsupported.

[53]    *See supra* note 22.

[54]    *See, e.g., China Biotics, Inc.*, Exchange Act Release No. 70800, 2013 WL 5883342, at \*11 n.72 (Nov. 4, 2013) ("While the presence of any . . . aggravating circumstances justify[] an increase in sanctions, their absence is not mitigating." (collecting cases)); *see also Harry Friedman*, Exchange Act Release No. 64486, 2011 WL 1825025, at \*9 (May 13, 2011) ("[Applicant's] violations may be aggravated by a registered representative taking affirmative actions to mislead the member firm, but this does not mean that the absence of misleading conduct is mitigating." (citing *Michael Frederick Siegel*, Exchange Act Release No. 58737, 2008 WL 4528192, at \*12 (Oct. 06, 2008), *petition denied in part and remanded in part*, 592 F.3d 147 (D.C. Cir. 2010)); Sanction Guidelines, *supra* note 33, at 6 ("[T]he presence of certain factors [in a given case] may be aggravating, but their absence does not draw an inference of mitigation.").

[55]    *See* Sanction Guidelines, *supra* note 33, at 6-7 (Principal Considerations Nos. 1, 10, 14, 15, and 18).

[56]    *Id.* at 6.

funds, which were not reasonable. West delayed returning his customer's funds for over two months and lied to Mouton about the reasons for the delay. Even after West found a new source of funds (a renter for his house), he again put his own financial interests ahead of his customer's. He delayed finalizing the renter's lease, which in turn delayed his repayment of the Deposit, so that he could negotiate a tax benefit for himself. Nor did West repay Mouton before detection or intervention. Mouton suspected that West had improperly used the Deposit and complained to regulatory authorities before West returned the Deposit. We accordingly find that West's repayment does not warrant a reduction of the sanction.[57]

We also reject West's related claim that there was no customer harm. As we have stated, "[t]he absence of . . . customer harm is not mitigating, as our public interest analysis focus[es] . . . on the welfare of investors generally."[58] Moreover, West's misconduct harmed his customer. By spending the Deposit without authorization, West put his customer's funds at risk for over four months. His delay in returning the Deposit deprived his customer of the ability to make other use of that money.[59]

We also reject West's assertion that the sanction should be reduced because his customer was sophisticated. As we have repeatedly held, both sophisticated and unsophisticated investors are entitled to protections against abuse under the securities laws.[60] And we consistently have upheld the imposition of a bar for misusing customer assets in other cases in which no mitigating factors were present.[61]

---

[57]    *See e.g., Otto v. SEC*, 253 F.3d 960, 967 (7th Cir. 2001) (sustaining bar and $35,000 fine despite repayment of the misused funds); *Joel Eugene Shaw*, Exchange Act Release No. 34509, 1994 WL 440927, at *2 (Aug. 10, 1994) ("Nor does the fact that [broker] ultimately repaid [customer] the money warrant permitting him to remain in the securities business."); *Ernest A. Cipriani*, Exchange Act Release No. 33675, 1994 WL 62106, at *3 (Feb. 24, 1994) (same); *Ramos*, 1988 WL 902244, at *4 (same).

[58]    *E.g., Brokaw*, 2013 WL 6044123, at *18; *Howard Braff*, Exchange Act Release No. 66467, 2012 WL 601003, at *7 (Feb. 24, 2012).

[59]    *Cf., e.g., Otto*, 2000 WL 1335346, at *4 (finding that registered representative, by using his customer's funds, "deprived [his customer] of the opportunity to invest those funds in a legitimate investment").

[60]    *Cf., e.g., Dolphin & Bradbury, Inc.* Exchange Act Release No. 54143, 2006 WL 1976000, at *9 (July 13, 2006) ("[T]he protection of the antifraud provisions of the securities laws extends to sophisticated investors as well as those less sophisticated."), *aff'd*, 512 F.3d 634 (D.C. Cir. 2008); *CMG Institutional Trading LLC*, Exchange Act Release No. 59325, 2009 WL 223617, at *10 (Jan. 30, 2009) ("NASD Rule 8210 does not lessen one's obligation to cooperate with an investigation based on the type of client served, nor are sophisticated or institutional investors without the need for protection against potential financial instability.").

[61]    *See supra* note 57; *see also Katz*, 2010 WL 358737, at *16 (affirming bar for, among other things, "causing funds to be transferred, without authorization"); *Bernard D. Gorniak*, Exchange Act Release No. 35996, 1995 WL 442063, at *2 (July 20, 1995) (sustaining bar where applicant delayed making trades and returning customer funds).

**D.    FINRA's sanction is remedial and not punitive.**

In addition to being consistent with the Sanction Guidelines, we find the imposition of a bar remedial and not punitive. West's deliberate misuse of customer funds placed his own interests ahead of his customer's. His misconduct, together with his other deceptive acts, further shows an inability to adhere to the high standards of business ethics required to participate in the securities industry.[62] Although West is not currently associated with a FINRA member, he has not ruled out the possibility of future association. While not denying that he spent his customer's funds, he fails to accept responsibility for his misconduct and continues to suggest that his actions are excusable, suggesting a risk of future violations.[63] The imposition of a bar will therefore prevent West from harming additional customers and will serve as a deterrent to other securities professionals tempted to misuse their customers' assets.[64]

\*       \*       \*

---

[62]    *Cf. Bateman, Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 315 (1985) (stating that the primary objective of the securities laws is the "protection of the investing public and the national economy through the promotion of 'a high standard of business ethics . . . in every facet of the securities industry'" (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186-87 (1963)).

[63]    *See Otto*, 253 F.3d at 967 (sustaining bar "[g]iven the ongoing deception in the face of a request for the return of her funds and [applicant's] refusal to accept responsibility for his misuse of [customer] funds"); *Conway*, 2013 WL 5960703, at \*11 (finding applicants' failure to "accept[] responsibility for their conduct" and deflection of blame to others supported conclusion they posed a risk of future violations).

[64]    Although "'general deterrence is not, by itself, sufficient justification for expulsion[,] . . . it may be considered as part of the overall remedial inquiry.'" *PAZ*, 494 F.3d at 1066 (quoting *McCarthy v. SEC*, 406 F.3d 179, 189 (2d Cir. 2005)).

20

## IV. Conclusion

For all the above reasons, we sustain FINRA's findings that West violated NASD Conduct Rule 2110 and the sanction imposed.

An appropriate order will issue.[65]

By the Commission (Chair WHITE and Commissioners GALLAGHER, STEIN, and PIWOWAR; Commissioner AGUILAR not participating).

Brent J. Fields
Secretary

By Jill M. Peterson
Assistant Secretary

---

[65] We have considered all of the parties' contentions. We have rejected or sustained them to the extent that they are inconsistent or in accord with the views expressed in this opinion. Because the issues have been thoroughly briefed and can be adequately determined on the basis of the record filed by the parties, Applicants' request for oral argument is denied. Rule of Practice 451, 17 C.F.R. § 201.451.

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 74030 / January 9, 2015

Admin. Proc. File No. 3-15811

In the Matter of the Application of

BLAIR ALEXANDER WEST
c/o Stanford R. Solomon, Esq.
The Solomon Group, P.A.
1881 West Kennedy Blvd.
Tampa, FL 33606-1606

For Review of Disciplinary Action Taken by

FINRA

ORDER SUSTAINING DISCIPLINARY ACTION TAKEN BY FINRA

On the basis of the Commission's opinion issued this day, it is

ORDERED that the disciplinary action taken by FINRA against Blair Alexander West is hereby sustained.

By the Commission.

Brent J. Fields
Secretary

By Jill M. Peterson
Assistant Secretary